UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

MICHELLE R. KAPLAN, *et al.*,          )
                                       )
    Plaintiffs                         )
                                       )
v.                                     )          1:14-cv-00276-DBH
                                       )
BLUE HILL MEMORIAL HOSPITAL,           )
                                       )
    Defendant                          )

## RECOMMENDED DECISION

In this action, Plaintiffs Michelle and Mark Kaplan allege retaliatory discharge and other related claims related to their employment with Defendant Blue Hill Memorial Hospital. The matter is before the Court on Defendant's Motion to Dismiss (ECF No. 4).[1]

In response to Defendant's Motion, Plaintiffs filed an Amended Complaint by which amendment Plaintiffs withdrew certain claims, and asserted additional facts in support of their other claims. Following a review of the pleadings, and after consideration of the parties' arguments, as explained below, the recommendation is that the Court deny Defendant's Motion.

### FACTUAL BACKGROUND

The facts set forth herein are derived from Plaintiffs' Amended Complaint, which facts are deemed true when evaluating the Motion to Dismiss.[2] *Beddall v. State St. Bank & Trust Co.*, 137 F.3d 12, 16 (1st Cir. 1998).

Plaintiffs Michelle and Mark Kaplan are married and reside in Ellsworth, Maine. Michelle Kaplan, a physician assistant, and Mark Kaplan, a physician, are former employees of Defendant

---

[1] The Court referred the motion for report and recommended decision.

[2] The reference to the facts as alleged should not be construed as a determination that the alleged facts are accurate. The alleged facts are recited in the context of the standard of review for a motion to dismiss.

Blue Hill Memorial Hospital (BHMH). Plaintiffs assert federal question jurisdiction (28 U.S.C. § 1331) based on whistleblower retaliation claims under the Emergency Medical Treatment and Active Labor Act (EMTALA), 42 U.S.C. § 1395dd (count I), and supplemental jurisdiction (28 U.S.C. § 1367) for state law claims of whistleblower retaliation (count II), fraud (count III), negligent misrepresentation (count IV), intentional interference with economic advantage (count V), and defamation (count VI).

*Allegations particular to Michelle Kaplan*

Michelle Kaplan accepted employment and began working for BHMH in February 2011. (Am. Compl. ¶ 12.) During her interview and subsequently, BHMH represented to Michelle Kaplan that BHMH would continue to employ physician assistants in the emergency room and that BHMH would not eliminate the position in order to hire licensed physicians. (*Id.* ¶ 13.) Michelle Kaplan relied on these representations when she accepted BHMH's offer of employment and during employment with BHMH. Her reliance included leaving her employment at Maine General Medical Center, declining employment offers at Calais Regional Hospital and Community Health and Counseling Services, selling her home at a financial loss, relocating her family to Blue Hill, and investing time and effort to become credentialed at BHMH. (*Id.* ¶ 17.)

In May 2012, BHMH's Vice President of Clinical Services, John Ronan, informed the physician assistants employed at BHMH, including Michelle Kaplan, that BHMH would transition to physician-only coverage of the emergency room through attrition only and that none of the physician assistants would be terminated as employees of BHMH. (*Id.* ¶ 16.) Nevertheless, on August 15, 2012, BHMH informed Michelle Kaplan that BHMH was terminating her employment because licensed physicians were to replace physician assistants in the BHMH emergency room. (*Id.* ¶ 18.) Mr. Ronan later informed Michelle Kaplan that the change was based on

recommendations that BHMH received from a consultant, the Studer Group. (*Id.* ¶ 19.) Michelle Kaplan alleges that BHMH commissioned and received this recommendation prior to her acceptance of employment. (*Id.* ¶ 14.)

Throughout her employment with BHMH, Michelle Kaplan informed BHMH of various practices that she believed to be in violation of EMTALA, or to present safety risks for patients. (*Id.* ¶ 20.) In addition, she documented in patient charts between 200 and 300 separate EMTALA violations. (*Id.* ¶ 21.)[3] Michelle Kaplan regularly notified Mr. Ronan and BHMH's Emergency Room Director, Dr. Joseph Babbitt, that the hospital's care did not comply with EMTALA. Her concerns included situations in which physicians or other "hospitalists" failed to see patients timely. (*Id.* ¶¶ 23-25.) On more than one occasion, she also reported to Dr. Babbitt at staff meetings that some specialists refused to transfer patients pending further diagnostic tests. (*Id.* ¶ 26.)

*Allegations particular to Dr. Mark Kaplan*

In July 2011, BHMH hired Mark Kaplan as an emergency room physician and granted him staff privileges. (*Id.* ¶¶ 28, 30.) While he was employed at BHMH, Dr. Kaplan notified hospital management of various practices that he believed to be in violation of EMTALA, or to present safety risks for patients. (*Id.* ¶ 31.) In May or June 2012, Dr. Kaplan reported to Mr. Ronan and Dr. Babbitt that surgeons employed by BHMH were inappropriately authorizing the transfer of patients to other health care facilities ("dumping"), in violation of EMTALA. (*Id.* ¶ 32.) Dr. Kaplan also reported to Mr. Ronan and Dr. Babbitt other objectionable acts by hospitalists who were asked to evaluate emergency room patients. Among the reported acts were the failure to see patients timely, and refusing to admit patients promptly. (*Id.* ¶ 33.) In August or September 2012,

---

[3] The Amended Complaint includes an itemization of 17 types of alleged violations. (*Id.* ¶ 22.)

Mr. Ronan and Dr. Babbitt instructed Dr. Kaplan to supplement a medical record and to conduct an examination of a patient under conditions that violate EMTALA. (*Id.* ¶ 36.)

In or about September 2012, Dr. Kaplan reported to BHMH's administration that Mr. Ronan had forbidden the emergency room to provide the specialist on-call list to the local ambulance service. Because of the failure to provide the list, ambulance attendants brought patients to BHMH's emergency room despite the fact that the necessary specialist was not available. As a result, patients would be transferred later from BHMH's hospital to another facility that had the proper coverage, allegedly in violation of EMTALA. (*Id.* ¶ 38.) In particular, Dr. Kaplan raised an EMTALA stabilization issue with Dr. Babbitt after a patient who was seen in the emergency room and diagnosed with an abdominal aortic aneurysm rupture was not transferred timely. (Id. ¶ 40.)

Dr. Babbitt, allegedly with bad faith and malice, cited Dr. Kaplan for being "manipulative" when Dr. Kaplan sought the admission of a patient who was complaining of chest pain and shortness of breath. The hospitalist had refused to see the patient in the emergency room, resulting in a delay in the screening and stabilization of the patient. (*Id.* ¶ 41.)

On or about October 25, 2012, BHMH reappointed Dr. Kaplan to the medical staff after a review of his credentials. (*Id.* ¶ 43.) The next day BHMH issued a letter of reprimand to Dr. Kaplan, which letter was issued in contravention of the bylaws. (*Id.* ¶¶ 44-45.)

According to Plaintiffs, on January 29, 2013, BHMH terminated Dr. Kaplan's employment contract, without cause, and later removed Dr. Kaplan from the active medical staff roster without due process. (*Id.* ¶ 48.) In February 2013, Dr. Kaplan received a job offer and was in the process of obtaining credentials to practice at the Houlton Regional Hospital as an Emergency Room physician (*Id.* ¶ 49.); was working in the emergency room at Maine Coast Memorial Hospital (*Id.*

¶ 50); was working as an emergency physician for ER Locum Tenens (*Id.*); and received an offer of employment at the Togus Veterans Hospital in Augusta. (*Id.* ¶ 51.) Plaintiffs maintain that these employers or prospective employers stopped their credentialing processes and withdrew their job offers because BHMH intentionally refused to provide information to them regarding Dr. Kaplan's medical knowledge and professional capabilities. (*Id.* ¶ 52.)

Plaintiffs contend that in February 2013, in retaliation for their report of the safety concerns and EMTALA violations, BHMH undertook professional review action against Dr. Kaplan in an attempt to revoke his medical staff privileges. (*Id.* ¶ 53.) During the review, BHMH did not follow the procedure set forth in its medical staff bylaws; failed to make a reasonable effort to develop the facts; failed to provide adequate notice and hearing; acted in the absence of a reasonable belief that the action was warranted; and applied a higher standard to Dr. Kaplan than to other emergency department physicians or hospitalists. (*Id.* ¶¶ 55-59.)

After completing the professional review process, in contravention of appropriate standards and procedures, BHMH revoked Dr. Kaplan's medical staff privileges and published the report of the adverse action to the National Practitioner's Data Bank (NPDB) and the Maine Board of Licensure in Medicine (MBLM). (*Id.* ¶ 60.) BHMH allegedly acted in bad faith and with malice in initiating the professional review action against Dr. Kaplan, and in reporting the adverse result to NPDB and MBLM. (*Id.* ¶ 61.)

## STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a party may seek dismissal of "a claim for relief in any pleading" if that party believes that the pleading fails "to state a claim upon which relief can be granted." In its assessment of the motion, a court must "assume the truth of all well-plead facts and give the plaintiffs the benefit of all reasonable inferences therefrom."

*Blanco v. Bath Iron Works Corp.*, 802 F. Supp. 2d 215, 221 (D. Me. 2011) (quoting *Genzyme Corp. v. Fed. Ins. Co.,* 622 F.3d 62, 68 (1st Cir. 2010)). To overcome the motion, a plaintiff must establish that the allegations raise a plausible basis for a fact finder to conclude that the defendant is legally responsible for one or more of the claims at issue. *Id.*

## DISCUSSION

**A.     Breach of Contract and Promissory Estoppel**

In their original complaint, Plaintiffs asserted claims for breach of contract and promissory estoppel. After the filing of Defendant's Motion to Dismiss, Plaintiffs filed their Amended Complaint pursuant to Rule 15(a)(1)(B). As the result of the Amended Complaint, Plaintiffs no longer assert claims for breach of contract or for promissory estoppel, rendering moot the portions of Defendant's Motion that challenge those claims.

**B.     EMTALA Retaliation (Count I)**

In Count I, Plaintiffs allege EMTALA whistleblower retaliation, 42 U.S.C. § 1395dd(i). Defendant argues that dismissal is appropriate because Plaintiffs have not alleged that Defendant "dumped" any patients (Motion to Dismiss at 4-5), or "that anyone appearing at the BHMH emergency department was either refused an initial medical examination or was transferred to another hospital in an unstable condition." (*Id.* at 8.)

"EMTALA is designed to prevent hospital emergency rooms from 'refusing to accept or treat patients with emergency conditions if the patient does not have medical insurance.'" *Alvarez-Torres v. Ryder Mem'l Hosp., Inc.*, 582 F.3d 47, 51 (1st Cir. 2009) (quoting *Correa v. Hosp. San Francisco,* 69 F.3d 1184, 1189 (1st Cir. 1995)). Under title 42 U.S.C. § 1395dd, a hospital with an emergency department must provide to individuals presenting for examination or treatment "an appropriate medical screening examination within the capability of the hospital's emergency

department, including ancillary services routinely available to the emergency department, to determine whether or not an emergency medical condition . . . exists." *Id.* § 1395dd(a).[4] When an individual is determined to have an emergency medical condition, the hospital must provide "for such further medical examination and such treatment as may be required to stabilize the medical condition" or a transfer to another medical facility. *Id.* § 1395dd(b).[5] The transfer of an individual who has not been stabilized is prohibited unless certain preconditions are satisfied. *Id.* § 1395dd(c); *see also Ramos-Cruz v. Centro Medico del Turabo*, 642 F.3d 17, 18 (1st Cir. 2011) ("EMTALA requires that 'if an emergency medical condition exists, the participating hospital must render the services that are necessary to stabilize the patient's condition ... unless transferring the patient to another facility is medically indicated and can be accomplished with relative safety.'") (quoting *Correa,* 69 F.3d at 1189). As these requirements suggest, "EMTALA ... 'is a limited anti-dumping statute, not a federal malpractice statute.'" *Ramos-Cruz*, 642 F.3d at 18 (quoting *Reynolds v. MaineGeneral Health*, 218 F.3d 78, 83 (1st Cir. 2000)).

EMTALA also provides for "whistleblower protection" as follows:

> A participating hospital may not penalize or take adverse action against a qualified medical person . . . or a physician because the person or physician refuses to authorize the transfer of an individual with an emergency medical condition that

---

[4] With respect to the screening obligation, the First Circuit has explained:

> "A hospital fulfills its statutory duty to screen patients in its emergency room if it provides for a screening examination reasonably calculated to identify critical medical conditions that may be afflicting symptomatic patients and provides that level of screening uniformly to all those who present substantially similar complaints. The essence of this requirement is that there be some screening procedure, and that it be administered even-handedly." When a hospital prescribes internal procedures for a screening examination, those internal procedures "set the parameters for an appropriate screening." A hospital thus must adhere to its own procedures in administering the screening examination.

*Cruz–Queipo v. Hospital Español Auxilio Mutuo de Puerto Rico,* 417 F.3d 67, 70 (1st Cir.2005) (quoting *Correa v. Hosp. San Francisco*, 69 F.3d 1184, 1192 (1st Cir. 1995) (internal quotation marks omitted)).

[5] "Emergency medical condition," "to stabilize," "stabilized," and "transfer" are all defined terms. 42 U.S.C. § 1395dd(e).

7

has not been stabilized or against any hospital employee because the employee reports a violation of a requirement of this section.

42 U.S.C.A. § 1395dd(i). To establish a prima facie claim of EMTALA retaliation, a plaintiff must prove (1) that he engaged in activity protected by EMTALA; (2) that he suffered an adverse employment action at the hand of his employer; and (3) that a causal connection exists between the protected activity and the employer's decision to impose the adverse employment action. *Elkharwily v. Mayo Holding Co.*, 955 F. Supp. 2d 988, 996 (D. Minn. 2013) (borrowing the standard applicable to Title VII retaliation claims); *O'Connor v. Jordan Hosp.*, No. 1: 10-cv-11416-MBB, 2013 WL 3105647, at *6 (D. Mass. June 17, 2013) (same).

Defendant argues that Plaintiffs have failed to allege that they reported an actual violation of EMTALA. Defendant contends that at most, Plaintiffs' allegations suggest emergency room quality of care issues, not disparate treatment of the uninsured. (Motion to Dismiss at 8.) Defendant argues that to maintain a whistleblower claim, Plaintiffs must allege actual EMTALA violations with some specificity.

At this stage of the proceedings, all inferences must be drawn in favor of Plaintiffs, who need only "plead enough facts to make entitlement to relief plausible in light of the evidentiary standard that will pertain at trial [and] need not plead facts sufficient to establish a prima facie case." *Rodríguez-Reyes v. Molina-Rodríguez*, 711 F.3d 49, 54 (1st Cir. 2013). While Plaintiffs allege some reports that might not constitute violations of EMTALA, they have asserted some facts that can reasonably be construed to be violations of EMTALA. More particularly, Plaintiffs have alleged that they made reports about violations of the screening and stabilization requirements of EMTALA.[6] Thus, even assuming, as Defendant argues, that Plaintiffs are required to allege

---

[6] For instance, Plaintiffs alleged that they reported that hospital personnel "routinely refused to evaluate or transfer" certain patients, "took inordinate amounts of time to see emergency room patients who required evaluation," and refused to see or admit emergency room patients who needed care. (Am. Compl. ¶¶ 22(a), 22(b), 22(d), 22(o), 33(a),

that they reported actual violations of EMTALA in order to sustain their whistleblower claim, Plaintiffs have satisfied that requirement.

**C.      Whistleblower Retaliation (Count II)**

In support of its challenge to Plaintiffs' claims under the Maine Whistleblower Protection Act, 26 M.R.S. § 833, Defendant reiterates the arguments asserted in connection with Plaintiffs' claims of EMTALA retaliation.  (Motion to Dismiss at 9.)

To prevail on a whistleblower claim under Maine law, an employee must demonstrate that: (1) the employee engaged in activity protected by the statute; (2) the employee was the subject of an adverse employment action; and (3) there was a causal link between the protected activity and the adverse employment action.  *Costain v. Sunbury Primary Care, P.A.*, 2008 ME 142, ¶ 6, 954 A.2d 1051, 1053.  Protected activity is established where, *inter alia*, "[t]he employee, acting in good faith, . . . reports orally or in writing to the employer or a public body what the employee has reasonable cause to believe is a violation of a law or rule adopted under the laws of this State, a political subdivision of this State or the United States."  26 M.R.S. § 833(1)(A).

As explained above, Plaintiffs have alleged facts from which one could reasonably conclude that Plaintiffs reported conduct or practices that could constitute a violation of law, and, as a result of the reports, they experienced adverse employment action.  Plaintiffs, therefore, have stated a claim for whistleblower retaliation under state law.

**D.      Fraud (Count III) and Negligent Misrepresentation (Count IV)**

Plaintiff Michelle Kaplan alleges that Defendant engaged in fraud and negligent misrepresentation to induce her to accept employment with and remain employed by Defendant. In particular, she alleges that she raised with Defendant the specific concern of whether Defendant

---

33(c)).  Plaintiffs also allege that Dr. Kaplan raised a "stabilization issue" with a particular emergency room patient. (Am. Compl. ¶ 40).

9

intended to transition from physician assistants to physician-only coverage in the emergency department, and that she relied on Defendant's assurance that her position would not be eliminated for that reason. (Amended Complaint ¶¶ 75-85.) Defendant maintains that Michelle Kaplan has not asserted a claim because given that her employment contract is terminable by either party, without cause (Michelle Kaplan's Provider Employment Agreement at 9, § 7.2.5, ECF No. 4-1),[7] Michelle Kaplan was not justified in relying on the alleged representation. (Motion to Dismiss at 12-14.) In addition, Defendant argues that a fraud claim cannot be based upon a misrepresentation regarding future performance, but can only be based on a representation of a then-existing fact. (*Id.*)

To prove a claim of fraudulent misrepresentation, a plaintiff must show that the defendant supplied false information concerning a material fact, with knowledge of the falsity or in reckless disregard of the falsity of the statement, in order to induce another to act or refrain from acting based on the false representation. *Knowlton v. Shaw*, 791 F. Supp. 2d 220, 261 (D. Me. 2011). A plaintiff must also show that he or she actually relied on the misrepresentation to his or her detriment and that the reliance was justified. *Id.* Proof of a claim of negligent misrepresentation is similar, except that the duty is measured by a standard of reasonable care. *Id.*; *see also Rand v. Bath Iron Works Corp.*, 2003 ME 122, ¶ 13, 832 A.2d 771, 774. In the employment context, claims of fraud and negligent misrepresentation are actionable, despite the fact that the "at will" doctrine of Maine employment law would preclude claims for breach of contract and promissory

---

[7] Neither the original complaint nor the Amended Complaint asserts that Michelle Kaplan and BHMH entered into a written contract. "Normally, documents not included in the original pleading cannot be considered on a Rule 12(b)(6) motion without converting the motion into one for summary judgment." *Parker v. Hurley*, 514 F.3d 87, 90 n.1 (1st Cir. 2008) (citing Fed. R. Civ. P. 12(b)). However, in her opposition memorandum Michelle Kaplan does not dispute that the written employment contract is authentic. Therefore, the Court may consider the contract without converting the motion to dismiss into a motion for summary judgment. *See id.*

estoppel. *See Rand*, 2003 ME 122, 832 A.2d 771 (reviewing Superior Court's *factual* findings following a bench trial on claims of intentional and negligent misrepresentation related to alleged promises about the duration of employment, in the absence of any written employment contract, where trial court had entered summary judgment on breach of contract claim based on the "at will" doctrine)[8]; *see also Popanz v. Peregrine Corp.*, 1998 ME 95, ¶¶ 5-6, 710 A.2d 250, 251-52 (holding in the absence of a written contract that oral promise that employee could retain her position indefinitely created no more than a contract of employment terminable at will, and affirming entry of summary judgment on breach of contract and promissory estoppel claims).

Defendant argues that because the written contract in this case permits termination "without cause," this case is distinguishable from some of the authority upon which Plaintiffs rely. Contrary to Defendant's argument, whether an agreement is terminable at will is a separate issue from whether a prior misrepresentation is actionable. In addition, under Maine law, the existence of a written agreement does not preclude recovery based on prior oral representations. *Ferrell v. Cox*, 617 A.2d 1003, 1006 (Me. 1992)[9] ("A signed agreement that contradicts prior oral statements does not bar an action for fraud as a matter of law. Parol evidence of fraudulent inducement may be introduced to show that a signed document does not reflect the intent of the parties."); *see also Darling v. W. Thrift & Loan*, 600 F. Supp. 2d 189, 197-200 (D. Me. 2009) (applying the same rule in the context of claims asserting lender liability, and applying the rule to both intentional and negligent misrepresentation claims); *Harriman v. Maddocks*, 518 A.2d 1027, 1029 (Me. 1986)

---

[8] *See also Rand v. Bath Iron Works Corp.*, No. Civ. A-99-083, 2002 WL 276783, 2002 Me. Super. Lexis 13 (Me. Sup. Ct., And. Cty., Feb. 1, 2002) (*Gorman, J.*).

[9] "In diversity jurisdiction, a federal court must draw the substantive rules of decision . . . from the law of the forum state." *Butler v. Balolia*, 736 F.3d 609, 612 (1st Cir. 2013). Where the state's highest court has not issued an opinion on the issue to be decided, "a federal court sitting in diversity should not simply throw up its hands but, rather, should endeavor to predict how that court would likely decide the question." *Id.* at 613.

(applying the same rule in the context of a written release). Consistent with this analysis, this Court ruled in the context of a wrongful termination case that claims of fraud and negligent misrepresentation survived a summary judgment motion despite the existence of a written employment contract specifying that the plaintiff was an "at will" employee. *Knowlton*, 791 F. Supp. 2d at 223.

Simply stated, Plaintiff Michelle Kaplan has alleged facts that support a plausible inference of detrimental reliance. Furthermore, she alleges that Defendant's representations relate to existing facts (*i.e.*, Defendant's then existing plans for its emergency department), and do not constitute "mere puffery about future events." *Id.* at 265. Plaintiff Michelle Kaplan thus has adequately stated her misrepresentation claims.[10]

**E.    Interference with Economic Advantage (Count V)**

Dr. Mark Kaplan alleges that Defendant used fraud and intimidation to interfere with economic relationships that he maintained or could have developed with Maine Coast Memorial Hospital, Houlton Regional Hospital, and the Department of Veterans Affairs. (Amended Complaint ¶¶ 84-99.) Defendant challenges the assertion that its conduct could reasonably be regarded as intimidating or fraudulent. (Motion to Dismiss at 16, Reply at 6, ECF No. 8.)

A claim of tortious interference with an advantageous relationship requires a showing of an existing contract or prospective economic advantage, interference with the contract or economic advantage through fraud or intimidation, and damages proximately caused by the interference. *Landsberg v. Me. Coast Reg'l Health Facilities*, 640 F. Supp. 2d 108, 113 (D. Me. 2009). To

---

[10] Defendant also argues that the Amended Complaint does not satisfy the particularity requirements of Rule 9(b). (Motion to Dismiss at 13.) However, Plaintiff has provided sufficient detail regarding "who allegedly uttered the misleading statements, to whom they were made, where they were made, when they occurred, and what actions they engendered." *Alternative Sys. Concepts, Inc. v. Synopsys, Inc.*, 374 F.3d 23, 30 (1st Cir. 2004). In particular, she identifies the content of the alleged misrepresentations, the timing, and two of the agents who allegedly made the representations. (Amended Complaint ¶¶ 9, 13, 16.)

demonstrate interference by fraud, the elements of fraud must also be shown, *i.e.*, the person alleged to have tortiously interfered with the relationship must have made a false representation of a material fact, with knowledge that the representation was false or in reckless disregard as to whether it was true or false, for the purpose of inducing another person to act or to refrain from acting. *Id.* The claimant also must have justifiably relied on the representation as true and acted upon it to the damage of the plaintiff. *Id.* To demonstrate interference by means of intimidation, a party must show coercion or extortion rather than fraud. *Id.*

According to Plaintiffs, Defendant manufactured a false basis for terminating Dr. Kaplan's employment in retaliation for his participation in protected conduct, and subsequently prevented him from pursuing other employment options by communicating this false or misleading information regarding his credentials. In other words, Plaintiffs allege that with knowledge that the information was false, Defendants communicated information to current and potential employers, which communication caused Dr. Kaplan to lose the employment opportunities. At this stage of the proceedings, Plaintiffs have alleged facts sufficient to state a claim of interference with Dr. Kaplan's advantageous economic relationships through fraud.

**F.    Defamation (Count VI)**

Dr. Kaplan alleges that after completing a flawed and retaliatory peer review, Defendant submitted a false or misleading report to the National Practitioner Data Bank and the Maine Board of Licensure in Medicine, in which report Defendant asserted that Dr. Kaplan provided "substandard or inadequate care" to four patients. (Am. Compl. ¶¶ 53-60, 101.) According to Dr. Kaplan, the report omitted material information regarding the patients in order to portray Dr. Kaplan in a false light. (Amended Complaint ¶ 102.) As alleged, Defendant's "description of event . . . omitted material information about the actual condition of the patient[s] and the treatment

provided . . . to portray Dr. Kaplan in a false light by creating the false impression that Dr. Kaplan was not medically competent and that he had harmed these particular patients." (*Id.*) Defendant argues that Dr. Kaplan's allegations are not sufficiently particularized to permit the Court to assess whether there is a basis upon which one could conclude that the statements were false. (Motion to Dismiss at 17-19.)

To state a claim for defamation, a plaintiff must sufficiently allege:

> (a) a false and defamatory statement concerning another; (b) an unprivileged publication to a third party; (c) fault amounting at least to negligence on the part of the publisher; and (d) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication.

*Lester v. Powers,* 596 A.2d 65, 69 (Me.1991) (quoting Restatement (Second) of Torts § 558).

A claim of false light publicity is a special type of defamation that arises from an invasion of privacy:

> One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if (a) the false light in which the other was placed would be highly offensive to a reasonable person, and (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.

*Cole v. Chandler*, 2000 ME 104, ¶ 17, 752 A.2d 1189, 1197 (quoting Restatement (Second) of Torts § 652E).

Defendant maintains that a plaintiff who alleges defamation must recite "precisely" the "particular statement" on which the claim is based. (Motion to Dismiss at 17, citing *Smith v. Heritage Salmon, Inc.*, 180 F. Supp. 2d 208, 221 (D. Me. 2002), and *Picard v. Brennan*, 307 A.2d 833, 835 (Me. 1973)). The case law upon which Defendant relies support the following: (1) a plaintiff's pleadings cannot rely entirely on ambiguous assertions of the content of the statements, such as by merely alleging that others discussed amongst themselves the reasons why the plaintiff

14

was fired, *Smith*, 180 F. Supp. 2d at 221; and (2) a plaintiff cannot alter materially the substance of his allegations at trial, but must prove the defamatory statements alleged in his complaint, *Picard*, 307 A.2d at 835. A plaintiff, however, is not required to satisfy the heightened pleading standard of Rule 9(b). Instead, the claim is subject to the more relaxed pleading requirements of Rule 8. *Bishop v. Costa*, 495 F. Supp. 2d 139, 140 (D. Me. 2007). A plaintiff must allege defamation to permit the defendant to respond and defend the claim. *Id.* at 141.[11]

In the Amended Complaint, Dr. Kaplan alleges that Defendant's written report to the National Practitioners Data Bank, which report is dated December 4, 2013, contained material falsehoods that were designed to suggest that Dr. Kaplan engaged in "substandard or inadequate care" regarding four patients discussed in the report. The allegation is sufficiently particularized to permit Defendant to respond and defend. As to the element of fault, Dr. Kaplan alleges that Defendant's motive in issuing the report was Defendant's desire to retaliate against Dr. Kaplan for his alleged whistleblower activity. (Am. Compl. ¶ 104.) Once again, Dr. Kaplan's allegations are sufficient to withstand Defendant's motion to dismiss.

## CONCLUSION

Based on the foregoing analysis, in each Count of the Amended Complaint, Plaintiffs have stated a claim upon which relief can be granted. Accordingly, the recommendation is that the Court deny Defendant's Motion to Dismiss (ECF No. 4).

---

[11] *Pan Am Systems v. Hardenbergh*, upon which Defendant also relies, is not to the contrary. As the Court stated in *Hardenbergh*, a defamation plaintiff must supply the "factual underpinning of how the statements are false." *Pan Am Sys., Inc. v. Hardenbergh*, 871 F. Supp. 2d 6, 16 (D. Me. 2012). Dr. Kaplan has alleged that statements, made in a specific report regarding the quality of care he provided to four specific patients, are materially false and that the quality of the care he provided was not, in fact, substandard.

## NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within fourteen (14) days of being served with a copy thereof. A responsive memorandum and any request for oral argument before the district judge shall be filed within fourteen (14) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ John C. Nivison
U.S. Magistrate Judge

Dated this 28th day of November, 2014.